**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| FERNANDO D. VALENTINE,<br><br>Plaintiff,<br><br>v.<br><br>DEPUTY WARDEN CHARLIE MARCUS, LIEUTENANT MARJORIE GILLUM, LIEUTENANT MIRACLE EDMONDS, UNIT MANAGER RAVEN DENNING, UNIT MANAGER TASHA BAKER, OFFICER DELISHA BRYANT, OFFICER KENTARUS THOMAS and OFFICER MARY DANIELS, each in their individual capacities,<br><br>Defendants. | Case No. 7:25-cv-103-WLS-ALS<br><br>JURY DEMAND |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff FERNANDO D. VALENTINE, by and through his undersigned attorneys, files this amended complaint against Georgia Department of Corrections employees Charlie Marcus, Marjorie Gillum, Miracle Edmonds, Raven Denning, Tasha Baker, Delisha Bryant, Kentarus Thomas and Mary Daniels, each in their individual capacities. Plaintiff, by counsel, alleges:

## INTRODUCTION

1. This case arises from Plaintiff's being housed within a tiny kiosk cage at Valdosta State Prison, a Georgia Department of Corrections facility, between March 5 and 15, 2025.

2. During that time Plaintiff had no access to a toilet or running water, was required to defecate into a plastic bag, had minimal access to drinking water, was frequently deprived of meals due to his not being in a listed cell, and could not lie down.

3. As a result of Defendants' actions, Plaintiff suffered severe hunger and dehydration, lightheadedness, claustrophobia, rashes all over his body, itching, and severe back spasms with cramping and sharp pain.

4. As a result of Defendants' actions, Plaintiff continues to suffer severe back spasms with sharp pain.

5. Plaintiff brings claims under the U.S. Constitution's Eighth Amendment: Unconstitutional Conditions of Confinement (all defendants) (Count I), Deliberate Indifference to Basic Human Needs (all defendants) (Count II), and Supervisory Liability (against Deputy Warden Charlie Marcus, Lt. Marjorie Gillum, Lt. Miracle Edmonds, and Unit Managers Raven Denning and Tasha Baker) (Count III).

6. At all relevant times Defendants were correctional staff employed by GDC and acting under color of state law.

7. Defendants are each sued in their individual capacities only.

**JURISDICTION**

8. Jurisdiction is proper under 28 U.S.C. §§1331 and 1343.

9. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the U.S. Constitution.

10. Venue is proper in the Middle District of Georgia because the events occurred within this District.

**PARTIES**

11. At all times relevant, Plaintiff was and is a citizen of Georgia.

12. On or about February 25, 2025, Plaintiff was a prisoner in the custody of Georgia Department of Corrections.

13. Plaintiff had up until that time never had any disciplinary infractions.

14. On or about that date Plaintiff was transferred to Valdosta State Prison.

15. Plaintiff was assigned to a dormitory but gang members demanded money to stay in the dorm.

16. Plaintiff's friend paid one hundred dollars and got a bed.

17. Plaintiff did not have money for a bed so gang members refused him access to the dorm.

18. Plaintiff was not a gang member.

19. Rather than subjugate and control the gang members, corrections staff acceded to the gang members and attempted to find Plaintiff separate housing.

20. On or about February 26, 2025, Officer Mary Daniels placed Plaintiff into a cage without a toilet, sink or any running water.

21. Plaintiff was housed in the cage for days with a fellow inmate Jimmy Honeycutt.

22. On or about March 5, 2025 Plaintiff was moved to a second cage, where he remained approximately nine days until March 15, 2025.

23. This second cage had a floor area of approximately four feet by four feet.

24. Plaintiff is six feet and four inches tall.

25. The second cage contained a kiosk, for visitations, but the kiosk was broken.

**No Toilet, Sink or Running Water**

26. This second cage ("Kiosk Cage") contained no toilet, sink or running water.

27. Plaintiff was not permitted to leave the Cage to use the toilet.

28. Rather, Plaintiff was provided a garbage bag to defecate and urinate in.

29. Plaintiff had limited toilet paper, which quickly ran out, and was not replaced.

30. Georgia Department of Corrections ("GDC") prisoners still typically have a modicum of privacy when using toilets in general population and in two-person confinement cells.

31. In the Kiosk Cage, however, Plaintiff had no privacy and was forced to defecate—using a garbage bag—in front of the entire dorm and passing officers, including females.

32. Defecating into the bag was awkward and difficult—and even more complicated without toilet paper—and Plaintiff sometimes ended up with feces and urine on his hands.

33. Plaintiff often lacked any water to clean his hands.

34. Plaintiff's health was threatened by his contact with his own feces and urine.

35. The garbage bag—full of feces and urine—remained in the Kiosk Cage, and Plaintiff was subjected to the ongoing, enduring stench of his own excrement.

36. Plaintiff was humiliated.

**Limited Drinking Water**

37. The Kiosk Cage dorm building was hot.

38. Plaintiff had to beg staff and orderlies for drinking water.

39. Plaintiff received insufficient liquids throughout his being housed in the Kiosk Cage.

40. As a result his urine was constantly dark, and he was severely dehydrated.

**Limited Movement**

41. The Kiosk Cage was too small for Plaintiff to stretch or move around.

42. Unable to stretch or move in the Kiosk Cage, Plaintiff repeatedly experienced severe, painful back and other muscle spasms.

43. His joints often severely tightened up hindering any ability to even slightly stretch.

44. The insufficient quantity of drinking water—and dehydration—exacerbated his spasms and cramping.

**Reduced Meals**

45. The Kiosk Cage had no cell number, causing Plaintiff to be overlooked for daily meal deliveries.

46. Plaintiff did not receive normally scheduled meals, unlike the inmates in nearby marked cells.

47. Plaintiff had to beg food service orderlies for meals and liquids.

48. During his stay in the Kiosk Cage, Plaintiff did not receive breakfast.

49. He occasionally received lunch.

**Limited Sleep**

50. Plaintiff had a mattress, which was too small for the Kiosk Cage.

51. Plaintiff could sit on the mattress but was unable to lie down to sleep.

52. Plaintiff was thus sleep deprived during his stay in the Kiosk Cage.

**No Recreation and Exercise**

53. While Plaintiff was housed in the Kiosk Cage, inmates from nearby cells were allowed to go outside for recreation and exercise.

54. During his stay in the Kiosk Cage, Plaintiff was never allowed to go out for recreation and exercise.

**Limited, Deferred Showering**

55. Normally inmates shower twice a week.

56. Plaintiff was finally removed from the Kiosk Cage by Officer Michel to shower after more than a week.

**No Ability to File Grievances**

57. While housed in the Kiosk Cage, Plaintiff repeatedly asked staff for grievance forms so he might grieve his conditions.

58. Staff would not provide him any forms, and Plaintiff was only able to grieve his conditions in the Kiosk Cage after he was removed from it.

59. Plaintiff felt as though he were being tortured.

**Staff Deliberate Indifference**

60. While Plaintiff was housed in the Kiosk Cage, prison staff deliberately ignored Plaintiff's repeated and persistent requests to use a toilet and sink, shower, have regular meals and an adequate supply of drinking water, provide him with grievance forms, and be removed from the Kiosk Cage.

***Deputy Warden Charlie Marcus***

61. While Plaintiff was housed in the Kiosk Cage, Valdosta State Prison Deputy Warden ("DW") Charlie Marcus day after day walked through and inspected the G dorm unit where the Kiosk Cage was located.

62. From the Kiosk Cage, Plaintiff repeatedly tried to talk to Marcus, asking to move to a different dorm and requesting access to a toilet and water.

63. Day after day Marcus saw Plaintiff in the Kiosk Cage, heard Plaintiff, and knew of his subhuman condition in the Kiosk Cage.

64. But each time Marcus deliberately ignored Plaintiff, said nothing to him, and day after day took no action to move him.

65. During the exact same time that Plaintiff was being held in his Kiosk Cage in G dorm, inmate Kenneth Greene, Jr. (GDC ID 0001298582) was similarly being held in another kiosk cage at Valdosta Prison, in K dorm. *See* Complaint (ECF No. 1), *Greene v. Odum et al.*, 7:25-cv-00064-LAG-ALS (M.D. Ga. 2025).

66. Greene also spoke with DW Marcus and complained about his conditions, but DW Marcus took no steps to rectify Greene's situation.

67. DW Marcus was well aware that prisoners were being held in cruel and unusual subhuman conditions—in kiosk cages—at Valdosta.

68. And just as DW Marcus was deliberately indifferent to Greene's circumstances, so too was he deliberately indifferent to Plaintiff's.

69. Marcus, as deputy warden, was a supervisor and also deliberately failed to instruct his subordinates to assist Plaintiff in any way.

***Marjorie Gillum***

70. While Plaintiff was housed in the Kiosk Cage, Lt. Marjorie Gillum would enter the unit for count.

71. Plaintiff repeatedly asked her for food, water, access to a toilet and shower, transfer to suitable housing, and grievance forms.

72. But she deliberately ignored his requests.

73. Plaintiff told her his back hurt, due to his inability to lie down in the Kiosk Cage, and asked her to send him to sick call for medical treatment for his spasms.

74. But she would not provide a sick call slip.

75. Gillum continually heard Plaintiff, was well aware of the dismal conditions of the Kiosk Cage, but continually and deliberately ignored him.

76. Finally she told him to stop talking to her and asking the same question because her answer would be the same, that she was not the one who housed him there.

77. Whether or not Gillum housed him there or not, at a minimum she had the authority and ability to remove him from the Kiosk Cage to shower, use a toilet and attend outdoor recreation, assure he was provided sufficient meals and liquids, and provide grievance forms.

78. Lt. Gillum as a supervisor deliberately failed to instruct her subordinates to assist Plaintiff in any way—e.g., to provide Plaintiff with water, a toilet, shower, grievance forms, and access to suitable housing.

***Miracle Edmonds***

79. Lieutenant Edmonds placed Plaintiff in the Kiosk cage.

80. She saw that the Kiosk Cage was only several feet in width and length and lacked a toilet and running water, but placed him there nevertheless.

81. She initially told Plaintiff she would find a bunk for him, but did not follow up on her promise, deliberately indifferent to the wanton cruelty of placing him in such a cage.

82. After initially placing him in the Kiosk Cage, she routinely appeared in the vicinity of the Cage, but deliberately ignored Plaintiff.

83. Throughout his stay in the Kiosk Cage, every time Lt. Edmonds came on shift, Plaintiff asked her for water.

84. Lt. Edmonds had an unobstructed view into the Kiosk Cage, and saw that he had no water.

85. As a lieutenant and shift supervisor she had the ability to obtain water for him but never brought him water or instructed anyone to bring him water.

86. On his second day in the Kiosk Cage, Plaintiff told her he needed the bathroom.

87. Lt. Edmonds heard him, but ignored him, even though as a lieutenant she had the authority to have him taken to a bathroom.

88. She made no attempt to solve his toilet issue, and did not even bring him a trash bag.

89. Every time Plaintiff saw Lt. Edmonds he told her he could not sleep.

90. She could see that the cage was too tiny for the mattress and that Plaintiff was exceptionally tall.

91. Plaintiff also told her he suffered from seizures and was claustrophobic.

92. He also asked her for grievance forms so he might at least grieve his plight.

93. Yet she deliberately ignored his pleas for help, even though as a lieutenant she had the authority to remove Plaintiff to a suitable living accommodation and provide grievance forms.

94. As a supervisor, at the very least she had the ability to provide Plaintiff—or order others to provide him—access to a toilet, water, shower, sufficient food, recreation and grievance forms.

95. Lt. Edmonds as a supervisor deliberately failed to instruct her subordinates to assist Plaintiff in any way—e.g., to provide Plaintiff with water, a toilet, shower, recreation, grievance forms, and access to suitable housing.

***Unit Manager Raven Denning***

96. Unit Manager Raven Denning was aware of Plaintiff's condition in the Kiosk Cage, the lack of space, toilet, water and food.

97. Plaintiff repeatedly asked her for food, water, access to a toilet and shower, transfer to suitable housing, and grievance forms.

98. Denning repeatedly deliberately ignored his requests.

99. As a unit manager, Denning had a supervisory role, with authority to move Plaintiff.

100. As a supervisor, at the very least she had the ability to provide Plaintiff—or order others to provide him—access to a toilet, water, shower, sufficient food, recreation and grievance forms.

101. Denning deliberately shirked her constitutional duty to provide Plaintiff with adequate living conditions.

### *Unit Manager Tasha Baker*

102. Unit Manager Tanya Baker regularly worked in G dorm while Plaintiff was housed in the Kiosk cage.

103. She was aware of Plaintiff's condition in the Kiosk Cage—lack of space, toilet and water.

104. She ignored his daily, repeated requests for access to a toilet, water, shower and to be moved.

105. Plaintiff repeatedly tried to ask her if he could be placed in a regular cell.

106. Baker however paid him no attention.

107. For example, she would count people in nearby cells, but then walk right past Plaintiff when he tried to get her attention, only a few feet away, deliberately ignoring him.

108. At one point she said it wasn't her job to help him, that her job was just to count.

109. In fact, as a unit manager, she was responsible for supervising correctional officers assigned to the housing unit; overseeing inmate housing assignments and movements; coordinating programs, counseling, and services within the unit; investigating incidents and preparing reports; and acting as a liaison between inmates and prison administration.

110. She deliberately shirked her duties as a unit manager, allowing Plaintiff to wallow in the filthy, tiny, waterless, toilet-less Kiosk Cage day after day.

111. As a supervisor, at the very least Baker had the ability to provide Plaintiff—or order others to provide him—access to a toilet, water, shower, sufficient food, recreation and grievance forms.

112. As a supervisor she deliberately failed to instruct her subordinates to assist Plaintiff in any way—e.g., to provide Plaintiff with water, a toilet, shower, grievance forms, recreation and access to suitable housing.

***Delisha Bryant***

113. Defendant Bryant was an officer who regularly worked in G dorm while Plaintiff was housed in the Kiosk Cage.

114. Bryant was well aware of the subhuman condition of the Kiosk Cage—its tiny size, and lack of a toilet and running water.

115. Plaintiff repeatedly tried to speak with Bryant, but she would not let him talk.

116. When Plaintiff asked her for anything—e.g., food, water, tissue, toilet, a shower, to be moved, a grievance form—she would cut him off and deliberately ignore his requests.

117. Other inmates yelled at her that Plaintiff had no bathroom and no water and needed help, but she ignored them as well.

118. At minimum, Bryant had the ability to provide Plaintiff with drinking water, food trays, tissue paper, grievance forms, and access to a shower, toilet and outdoor recreation.

119. But Bryant said Plaintiff's situation was not her concern and deliberately and maliciously heeded none of Plaintiff's requests.

120. She did not merely ignore his requests, but was mean and rude and said helping him wasn't her "motherfucking job."

***Kentarus Thomas***

121. Officer Kentarus Thomas routinely worked in Valdosta G dorm while Plaintiff was housed in the Kiosk Cage there.

122. Plaintiff repeatedly asked Thomas for assistance—food, toilet, water, adequate housing, and grievance forms.

123. Thomas was well aware of Plaintiff's subhuman condition in the Kiosk Cage.

124. At minimum, Thomas had the ability to provide Plaintiff with drinking water, food trays, tissue paper, grievance forms, and access to a shower, toilet and outdoor recreation.

125. But Thomas repeatedly and deliberately ignored Plaintiff's requests.

***Mary Daniels***

126. Officer Mary Daniels routinely worked in Valdosta G dorm while Plaintiff was housed in the kiosk Cage there.

127. Plaintiff repeatedly asked Daniels for assistance—food, toilet, water, adequate housing, and grievance forms.

128. Daniels was well aware of Plaintiff's subhuman condition in the Cage.

129. At minimum, Daniels had the ability to provide Plaintiff with drinking water, food trays, tissue paper, grievance forms, and access to a shower, toilet and outdoor recreation.

130. But Daniels repeatedly and deliberately ignored Plaintiff's requests.

## COUNT I

### Eighth Amendment Unconstitutional Conditions of Confinement
**(all Defendants)**

131. Plaintiff repeats and re-alleges paragraphs 1 through 130 above, as if fully set forth herein and further alleges:

132. The Eighth Amendment prohibits prison officials from subjecting prisoners to conditions that deprive them of the minimal civilized measure of life's necessities.

133. Plaintiff's confinement in the Kiosk Cage exposed him to objectively serious and extreme conditions, including the absence of a toilet, sink, and running water; inadequate drinking water; inadequate nutrition; inability to lie down or sleep normally; prolonged exposure to his own human waste; denial of recreation; denial of regular shower access; and confinement in an extremely cramped space that prevented normal movement and exacerbated painful muscle spasms.

134. These conditions, taken individually and especially in combination, posed a substantial risk of serious harm to Plaintiff's health and safety.

135. Each Defendant was personally aware of Plaintiff's confinement in the Kiosk Cage and the conditions therein.

136. Each Defendant observed, or had the opportunity to observe, that Plaintiff lacked access to basic human necessities and was repeatedly complaining of those conditions.

137. Nevertheless, each Defendant knowingly permitted Plaintiff to remain subjected to those conditions and failed to take reasonable measures to alleviate them.

138. As a direct and proximate result of Defendants' conduct, Plaintiff suffered hunger, dehydration, sleep deprivation, humiliation, exposure to unsanitary conditions, physical pain, back spasms, cramping, rashes, itching, emotional distress, and other injuries, some of which continue to the present day.

139. Defendants' actions and omissions were intentional, malicious, reckless, and undertaken with callous disregard for Plaintiff's federally protected rights, entitling him to compensatory and punitive damages.

## COUNT II

### Eighth Amendment Deliberate Indifference to Basic Human Needs
### (all Defendants)

140. Plaintiff repeats and re-alleges paragraphs 1 through 130 above, as if fully set forth herein and further alleges:

141. At all relevant times, Plaintiff had serious and obvious needs for adequate drinking water, sanitation, toilet access, food, sleep, hygiene, exercise, and minimally humane housing conditions.

142. These needs were readily apparent to any reasonable correctional officer.

143. Plaintiff repeatedly informed Defendants that he lacked water, access to a toilet, adequate meals, access to showers, grievance forms, and suitable housing.

144. Plaintiff also informed Defendants that he was suffering physical pain, back spasms, inability to sleep, dehydration, and other adverse effects from his confinement in the Kiosk Cage.

145. Defendants therefore possessed actual subjective knowledge that Plaintiff faced a substantial risk of serious harm.

146. Despite that knowledge, Defendants intentionally refused to provide Plaintiff adequate relief.

147. Defendants ignored his pleas, denied or withheld assistance, failed to obtain readily available accommodations, and consciously disregarded the substantial risks posed by the conditions under which Plaintiff was confined.

148. Reasonable corrective measures were available to Defendants, including providing water, toilet access, hygienic supplies, meals, showers, recreation opportunities, grievance forms, and transfer to a suitable housing location, but Defendants deliberately failed to take such measures.

149. Defendants' conduct constituted deliberate indifference to Plaintiff's basic human needs and health and safety in violation of the Eighth Amendment.

150. As a direct and proximate result of Defendants' deliberate indifference, Plaintiff suffered the injuries and damages described herein and is entitled to compensatory and punitive damages.

## COUNT III

**Eighth Amendment Supervisory Liability**
**(Defendants Deputy Warden Charlie Marcus, Lt. Marjorie Gillum, Lt. Miracle Edmonds, and Unit Managers Raven Denning and Tasha Baker)**

151. Plaintiff repeats and re-alleges paragraphs 1 through 130 above, as if fully set forth herein and further alleges:

152. Defendants Charlie Marcus, Marjorie Gillum, Miracle Edmonds, Raven Denning, and Tasha Baker held supervisory positions at Valdosta State Prison and possessed authority over subordinate correctional officers, inmate housing, inmate welfare, and the conditions under which Plaintiff was confined.

153. Each supervisory Defendant personally knew that Plaintiff was housed in the Kiosk Cage without access to basic human necessities and repeatedly received notice of Plaintiff's conditions through direct observation, Plaintiff's repeated verbal complaints, or both.

154. Despite possessing authority to intervene, each supervisory Defendant failed to take reasonable corrective action.

155. Each supervisory Defendant either directly participated in the constitutional violations, directed subordinates to allow the unconstitutional conditions to continue, or knowingly failed to stop the violations despite having the authority and opportunity to do so.

156. Each supervisory Defendant also failed to instruct, supervise, or direct subordinate officers to provide Plaintiff constitutionally adequate living conditions, sanitation, water, food, hygiene, recreation, and housing.

157. The unconstitutional conditions were not isolated or hidden.

158. They were open, obvious, continuous, and persisted for approximately nine days.

159. The supervisory Defendants' repeated failures to act in the face of known constitutional violations constituted deliberate indifference and established a causal connection between their conduct and Plaintiff's injuries.

160. Defendant Charlie Marcus additionally possessed knowledge that prisoners were being housed in kiosk cages under substantially similar conditions and nevertheless failed to remedy the practice, further demonstrating deliberate indifference to a known risk of constitutional injury.

161. As a direct and proximate result of the supervisory Defendants' actions and omissions, Plaintiff suffered the injuries and damages described herein and is entitled to compensatory and punitive damages.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

**ADDITIONAL PRAYER FOR RELIEF**

WHEREFORE, Plaintiff further demands:

A. Compensatory damages;

B. Punitive damages against each individual defendant;

C. Costs and attorney's fees pursuant to 42 U.S.C. §1988;

D. Prejudgment and post-judgment interest;

E. Such further relief as the Court deems just and proper.

Dated: November 20, 2026.

Respectfully submitted,

*/s/ Joshua Tarjan*
Joshua Tarjan
Florida Bar No. 107092

THE TARJAN LAW FIRM P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156
(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com
*Pro Hac Vice*

/s/ James M. Slater
James M. Slater
Georgia Bar No. 169869
SLATER LEGAL PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I electronically filed the foregoing document with the Clerk by using the CM/ECF system, which will serve a copy on any counsel of record.

By: *<u>/s/ Joshua Tarjan</u>*
Joshua Tarjan